716 A.2d 353

## CONCERNED CITIZENS OF GREAT FALLS, MARYLAND, et al.

v.

## CONSTELLATION–POTOMAC, L.L.C., et al.

No. 1437, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Aug. 28, 1998.

702

**704**

Norman G. Knopf (Dennis M. Cate and Knopf & Brown, on the brief), Washington, DC, for appellants.

Timothy Dugan (Larry A. Gordon and Wilkes, Artis, Hedrick & Lane, on the brief), Bethesda, for appellee, Constellation.

A. Katherine Hart, Sr. Asst. County Atty. (Charles W. Thompson, Jr., County Atty., Marc P. Hansen, Chief, Div. of General Counsel and Karen L. Federman Henry, Principal Counsel for Appeals, on the brief), Rockville, for appellee, Montgomery County.

Argued before HARRELL, HOLLANDER and BYRNES, JJ.

HARRELL, Judge.

On Motion for Reconsideration

*"Pictures, I think, in this case can be quite complicated."* [1]

This case arises from the 3 December 1996 decision of the Montgomery County Board of Appeals ("Board of Appeals" or "the Board") granting appellee Constellation–Potomac, L.L.C.'s ("Constellation") petition for a special exception for the construction and operation of a seniors care home for up to ninety residents on property located at the intersection of Falls Road and MacArthur Boulevard in Potomac, Maryland, opposite the main entrance to Great Falls National Park

---

[1]. The then-Chair of the Montgomery County Board of Appeals offered this comment during the course of the 1 October 1996 hearing regarding pictorial exhibits in this case.

("National Park").[2] Prior to issuing its decision, the Board of Appeals conducted eight days of hearings between March and November 1996.

Subsequent to the Board of Appeals's decision, on 13 December 1996, the petition's opponents, among them appellants in the present case, Concerned Citizens of Great Falls, Maryland; Margaret and Robert Dennis; Rosalind Allen; and Carl and Rebecca Locker (collectively referred to as "Concerned Citizens"); filed a written Request for Reconsideration with the Board of Appeals.[3] The Board of Appeals adopted a Resolution to Deny [Appellants'] Motion for Reconsideration on 18 December 1996, effective 31 December 1996.

On 2 January 1997, the Concerned Citizens filed a Petition for Judicial Review in the Circuit Court for Montgomery County. Constellation responded to Concerned Citizen's petition on 16 January 1997. On 11 March 1997, appellee Montgomery County, Maryland ("the County"), filed a timely Motion to Intervene in this case on behalf of the Montgomery County Board of Appeals, which the court granted on 27 March 1997.[4]

On 30 April 1997, 29 May 1997, and 30 May 1997, Concerned Citizens, Constellation, and the County, respectively, filed Memoranda of Law, and on 16 June 1997, Concerned Citizens filed a Reply Memorandum. On 26 June 1997 the circuit court held a hearing in this matter, and delivered an oral ruling from the bench affirming the Board's decision to approve the

---

2. Both Concerned Citizens and appellees, in their respective appellate briefs, refer to the National Park as the C & O National Historic Park. In both the Board of Appeals decision and the transcripts from the hearings, the park is referred to as Great Falls National Park. For purposes of this opinion, we will refer to the park as "Great Falls National Park" or the "National Park."

3. We list only those opponents to the petition who are before this Court in the present appeal.

4. For purposes of this opinion, unless the County posits an argument that differs substantially from Constellation's argument, we will refer to the two appellees, the County and Constellation, collectively as "Constellation."

special exception for the care home. On 16 July 1997, the court filed a written order memorializing the same and attaching the transcript of the court's 26 June 1997 bench ruling. On 14 August 1997, Concerned Citizens filed a timely appeal to this Court,[5] raising the following issues for our consideration, which we have rephrased and reorganized:

I. Whether the Board of Appeals violated its own procedural rules or the Montgomery County Zoning Ordinance when it permitted Constellation to revise its application for the special exception on 25 November 1996, the last day of the hearings, but failed to give Concerned Citizens additional time to respond to the revisions and failed to leave the record open for an additional time period following the hearing.

II. Whether the Board of Appeals applied the correct legal standards in making its determination to approve the special exception.

III. Whether the Board of Appeals, before making its determination to approve the special exception, made all the findings of fact required by the Montgomery County Zoning Ordinance.

We conclude that the Board of Appeals violated its own procedural rules and the Montgomery County Zoning Ordinance when it permitted Constellation to submit amendments to its special exception application and to submit new exhibits on the last day of the hearings. We further conclude that the Board's decision to deny Concerned Citizens' request for additional time to respond to the amendments and exhibits, and instead to close the record at the conclusion of the hearing, rendered the preceding errors prejudicial. Accordingly, we vacate the judgment of the circuit court and remand the case to the circuit court with instructions that it return the

---

5. Our original reported opinion in the instant appeal was filed on 30 June 1998. On or about 27 July 1998, the County filed a motion for reconsideration seeking certain technical, non-substantive revisions. That motion was granted on or about 25 August 1998, the 30 June 1998 opinion was recalled, and this amended opinion filed in response to the County's motion.

case to the Board of Appeals for the purpose of allowing Concerned Citizens a reasonable opportunity to respond to Constellation's revised petition. Because our conclusion necessarily demands that the Board of Appeals render a new decision in light of any new evidence presented, we need not reach Issues II. and III. herein, although we will offer, for the parties' consideration, a passing comment regarding a facet of Issue II.

## FACTS

On 11 December 1995, pursuant to section 59–G–2.37 of the Montgomery County Zoning Ordinance ("Zoning Ordinance"),[6] Constellation filed a petition for a special exception [7] with the Board of Appeals for Montgomery County to construct and operate a care home, known as "The Residence at Great Falls" ("the project" or "the Residence"), for the purpose of providing comprehensive care and support for up to ninety elderly residents. Constellation's petition was assigned Case No. S–2212.

### Background Facts: The Original Petition

The property at issue is located at the northeast corner of the intersection of MacArthur Boulevard and Falls Road in Potomac, Maryland. The site consists of approximately 3.5 acres and is zoned R–200.[8] The site is located diagonally

---

**6.** Section 59–G–2.37 of the Zoning Ordinance sets forth the zoning provisions governing nursing homes and domiciliary care homes. *See* Montgomery County Code, Chapter 59 (Zoning Ordinance), § 59–G–2.37 (1998). We note that the Montgomery County District Council, pursuant to Ordinance No. 13–47, amended section 59–G–2.37 of the Zoning Ordinance, effective 24 February 1997. Because we address only the procedural issues related to Constellation's amendments to its petition, the 1997 changes to section 59–G–2.37 are irrelevant to our discussion.

**7.** Both sections 59–A–4.2 and 59–G of the Zoning Ordinance govern the process of petitioning for a special exception.

**8.** A R–200 designation indicates that the area is zoned as a one-family, residential zone with a minimum lot area requirement of twenty thou-

across the street from the entrance to Great Falls National Park. It has 474.5 feet of frontage along MacArthur Boulevard and 382 feet of frontage along Falls Road. About five percent of the property is forest and the remainder of the property is either cleared or contains shrub growth.

The surrounding neighborhood[9] is primarily residential. The neighborhood in the immediate vicinity of the project site contains "modestly-sized" homes on one acre lots.[10] Across Falls Road to the west, the property is developed with single-family, detached homes on lots in excess of two acres, and on the east side of Falls Road, which is north and east of the subject property, most of the property contains single-family, detached homes built on lots of approximately one acre. One-half mile southeast on MacArthur Boulevard is an area that includes single-family, detached homes as well as townhouses. In addition, the area to the south of the subject property also contains townhouses. Also in the area is a VFW Hall, located on the entrance road to the national park, and Old Angler's Inn restaurant and a conference center, both located on MacArthur Boulevard.

The home of appellants Peggy and Robert Dennis is located in the neighborhood immediately to the east of the project

_____

sand square feet. *See* Montgomery County Code, Chapter 59 (Zoning Ordinance), § 59–C–1.1 (1997).

9. What constitutes the "surrounding neighborhood" was the subject of some dispute at the Board's hearings. Constellation contended that the surrounding neighborhood included an area of approximately one-half mile in all directions from the site. Concerned Citizens, on the other hand, defined the surrounding neighborhood as those homes in the "immediate vicinity" of the site. Because we primarily are concerned with the procedure the Board of Appeals followed when Constellation offered amendments to its petition, we need not concern ourselves with whether the Board of Appeals properly resolved the parties' definitional dispute. For the purpose of providing background information about the site, we include descriptions of both the area immediately surrounding the site and the area extending one-half mile in all directions.

10. At the Board of Appeals hearing on 1 October 1996, appellant Robert Dennis testified that the homes in the immediate vicinity of the project are "very small and very modest." This description includes his own home, which is located immediately to the east of the project.

site. Mr. Dennis described their home as a custom-built timber frame house, one story, with a walk-out basement. He noted that from the back, the house appears to be a one story with a walk-out basement, but that from the front, the house appears to be a two story house. The house is approximately forty feet by seventy feet in dimension. The Dennis home fronts on Fawsett Road. The family room is along the back of the house, on the second floor, with windows directly facing the proposed project.

In its initial petition, Constellation described the proposed care home as follows:

The Residence is designed in the "Prairie Style" of Frank Lloyd Wright—a style that is intended to mesh with the natural terrain and environment. The Residence will consist of 78 assisted living units in a 3 story above grade building and an additional level partially below grade visible from the rear of the property.... The building will comprise about 60,975 square feet of gross Floor Area ("GFA") and be about 40 feet high. The building footprint will be about 16,292 square feet and will be located on the 3.5 acre site.

✳ * * ✳ * *

The Residence is an L-shaped building. Its main entrance is on MacArthur Boulevard. The building has a masonry and stucco exterior with precast/stucco accent bands at the 1st and 3rd floors and a shingle hip roof creating a strong residential character to the building. The use of ornamental balcony railings, casement windows, and additional detailing at the ground reinforces the residential quality of the building.

✳ * * ✳ * *

The height of the building as height is defined in the Zoning Ordinance is about 40 feet, which is below the maximum allowable height of fifty feet. The height in conjunction with the substantial setbacks and landscaping minimizes the bulk in relation to the surrounding community.

In addition to the foregoing written description of the building, the petition included, among other things, a computer-generated diagram of the proposed care home, a site plan, floor plans for the structure, a site analysis, and a planting and forest conservation plan (the landscaping plan).

As depicted in the original site and floor plans, the building is in the shape of an L, with two long wings that join together in a central core. The wings contain the residential units and the central core contains the community areas, including the dining room. One of the wings fronts on Falls Road; the other fronts on MacArthur Boulevard. The central core sits at the intersection of Falls and MacArthur. Translating a one inch to thirty feet scale on the drawing, the east wing, at its longest point, measured approximately 70 feet in width and approximately 165 feet in length. Using the same scale, the west wing, at its longest point, measured approximately 81 feet in width and approximately 180 feet in length. These measurements include the length of the central core.

As noted above, the proposed building is three stories when viewed from Falls and MacArthur and has a fourth lower level with access to a rear courtyard and garden located along the northeast side of the building. The "Site Analysis" included with the original petition provides the following information regarding the height of the building: [11] In the Falls Road wing, the height of the dining room (the highest portion of the building) is 38 feet and 11.5 inches and the remainder of that wing has a height of 31 feet 8.5 inches. In the MacArthur Boulevard wing, the height of the dining room is 40 feet 8.5 inches and the remainder of that wing has a height of 35 feet 3.5 inches. The Site Analysis also set forth the following building setbacks: front—75 feet; back—110 feet; and side—150 feet. In addition, it indicated that the site would have 35 off-street parking spaces.

---

11. Building height is measured from average finish grade along building facade to mean roof height.

Lastly, the landscaping plan attached to the original petition set forth the placement and the type of trees, bushes, and grasses to be planted on the site. The landscaping plant list included the names of each plant, the quantity to be planted, and the height of each tree upon planting.

### *December 1995 to October 1996: The Progression of the Petition*

By letter dated 22 January 1996, Constellation filed a Motion to Amend the Petition pursuant to section 59–A–4.24 of the Montgomery County Zoning Ordinance.[12] The stated purpose of the amendments was to:

a. improve the appearance of the site;

b. describe the lighting plan;

c. better illustrate the heavy buffering and landscaping proposed;

d. increase the amount of stormwater management provided on site; and

e. provide a more streamlined approach for delivery and trash vehicles.

Included among the specific amendments proposed were: (1) an amended Site Plan, which described, among other things, a widening of the building's hallways, an increase in the number

---

**12.** Section 59–A–4.24 provides:

Amendment of Petition.

An applicant may amend this statement prior to the hearing, upon consent of the board, following a motion to amend and 10 days' notice thereof to all parties entitled to original notice of filing. Amendments that are found by the board to alter materially a petitioner's proposal or evidence are cause to postpone the hearing to a date that permits all interested parties, including but not limited to public agencies, adequate time to review the amendment. The amendment must also be referred to the planning board, in accordance with subsection 59–A–4.48(c). Nothing in this section prohibits the board, during the hearing or at any time before the record is closed, from requesting the applicant to revise any aspect of the proposal.

Montgomery County Code, Chapter 59 (Zoning Ordinance), § 59–A–4.24 (1997).

of parking spaces, and a change in the length of the rear yard setback; (2) an amended Planting and Forest Conservation Plan, which showed, among other things, a revision of the mix of plant materials to be used for buffering and screening along the rear of the property; (3) revised architectural drawings, which reflected that the building would contain seventy-eight, rather than seventy-four living units; and (4) a revised site analysis to reflect the amendments to the engineering plans and the architectural drawings. The motion also introduced one of the witnesses Constellation planned to offer at the hearing.

On 23 January 1996, the Board of Appeals filed a Notice of Receipt of Additional Exhibits. The notice provided that individuals could review the additional exhibits in the Board of Appeals's office. The notice was sent to a list of interested parties including all contiguous and confronting property owners.[13]

By letter dated 29 February 1996, Constellation filed another Motion to Amend the Petition. Therein, Constellation submitted the following additional exhibits: (1) a Land Planning Report, dated 27 February 1996, from Philip E. Perrine, of Perrine Planning and Zoning and (2) a letter dated 6 February 1996 from Edward P. Novak[14] to Margaret and Robert Dennis concerning their meeting about modifications to the lighting and landscaping plan, which Constellation agreed to include when preparing the final approved special exception landscape and lighting plan. The motion also contained a list of the expert witnesses Constellation planned to call at the hearing.

---

**13.** The record indicates that as of the time the Board of Appeals sent this notice, 23 January 1996, Concerned Citizens had not yet notified the Board of its existence or its representation. As described *infra,* Concerned Citizens, by letter dated 8 March 1996, notified the Board of Appeals of its existence and its opposition to Constellation's petition.

**14.** Edward P. Novak was the President of Nova–Habitat, Inc., one of the developers of the Residence at Great Falls project. Nova–Habitat is not a party to the present appeal.

Concerned Citizens, by letter dated 8 March 1996, asked the Montgomery County Planning Board ("Planning Board") to recommend that the Board of Appeals reject Constellation's petition for a special exception. Concerned Citizens further requested the Planning Board to recommend that Constellation "redesign the project to greatly change its design, and reduce its bulk and intensity, so as to make it more compatible with the surrounding area, as well as to correct other deficiencies."

By memorandum dated 8 March 1996 and received by the Board of Appeals on 13 March 1996, the Maryland–National Capital Park and Planning Commission (M–NCPPC) planning staff ("the technical staff") of the Planning Board issued a report reviewing Constellation's petition for a special exception. *See* Montgomery County Code, Chapter 59 (Zoning Ordinance), § 59–A–4.48 (1997). Therein, the technical staff recommended that the Planning Board recommend approval of the special exception with certain conditions, including, among other things, approval of a stormwater management plan by the Montgomery County Department of Environmental Protection prior to the issuance of building permits; and approval of a revised landscape, lighting, and signage plan by the M–NCPPC technical staff prior to obtaining a building permit.

Constellation, on 11 March 1996, offered another Motion to Amend the Petition for the purpose of submitting the opinion and analysis of Lipman, Frizzel & Mitchell, L.L.C., real estate valuation consultants, regarding whether the proposed special exception would be detrimental to the economic value or development of surrounding properties or the general neighborhood.

On 14 March 1996, the Board of Appeals filed a Notice of Receipt of Additional Exhibits with regard to Constellation's 29 February 1996 and 11 March 1996 motions to amend the petition. This notice was sent to Norman Knopf, Esquire, attorney for Concerned Citizens. On 18 March 1996 Concerned Citizens filed a letter with the Board of Appeals setting

forth its list of anticipated expert and lay witnesses for the hearing.

On 22 March 1996, the Board of Appeals received a letter from William H. Hussman, the Chair of the Planning Board, setting forth the Planning Board's recommendation that the Board of Appeals deny Constellation's special exception petition. Therein, the Planning Board set forth its concerns about the petition, and in conclusion stated its recommendation that

> the applicant needs to make a stronger case to support the finding of need[15] by taking into account all the applications in the area for a similar use that have received approval, whether they are built or not, revise the plan so that it is less intense, and design a building that is more in character and scale with the residential community in which it would be located.

On 27 March 1996, the Board of Appeals held the first of what would be a total of eight days of hearings on this matter. Constellation commenced its case, offering Edward Novak of Nova–Habitat, Inc. In addition, David Murphy of the National Park Service offered a brief statement on behalf of Concerned

---

**15.** The finding of need that the Planning Board referred to in its letter was derived from section 59–G–1.25 of the Zoning Ordinance, which provides that certain

> special exceptions may only be granted when the Board, the Hearing Examiner, or the District Council, as the case may be, finds from a preponderance of the evidence of record that, for the public convenience and service, a need exists for the proposed use due to an insufficient number of similar uses presently available to serve existing population concentrations in the County, and that the uses at the location proposed will not result in a multiplicity or saturation of similar uses in the same general neighborhood of the proposed use....

See Montgomery County Code, Chapter 59 (Zoning Ordinance), § 59–G1.25 (1998) (emphasis added). Pursuant to Ordinance No. 13–47, effective 24 February 1997, the County Council deleted "nursing and care home" from the list of special exceptions that require a need analysis. Therefore, in all its decisions regarding special exceptions for nursing and care homes following 24 February 1997, the Board of Appeals need not determine whether a section 59–G–1.25 "need" for the use proposed by the special exception exists.

Citizens and Alan Squier,[16] a property owner residing in the immediate vicinity of the project, also testified.[17]

By letter dated 28 May 1996, Constellation filed a Motion to Amend the Petition in order to submit a letter of explanation and exhibits concerning the porte cochere,[18] the surrounding area, and the elimination of the gazebo. The letter indicated that Constellation sent a carbon copy of the letter and the exhibits to Concerned Citizen's attorney.[19]

Constellation continued its case on 4 June 1996, the second day of the Board of Appeals's hearings. Two witnesses testified on behalf of Constellation: Phil Perrine of Perrine Planning and Zoning; and Richard Morris, the owner and president of William Morris Architects.

By letter dated 28 June 1996, Constellation filed a Motion to Amend the Petition. Therein, Constellation requested the opportunity to amend in order to submit a letter of explanation, a marketing report addressing the need for the special exception use, and the resume of the expert market analyst who Constellation expected to testify at the 30 July 1996 hearing. In the letter, Constellation stated that it was sending a copy with the enclosures to Concerned Citizens' attorney. In addition, on 8 July 1996, the Board of Appeals filed a Notice of Receipt of Additional Exhibits and notified Concerned Citizens' attorney.

---

**16.** Mr. Knopf, Concerned Citizens' attorney, did not represent Alan Squier.

**17.** Because our disposition ultimately rests on a procedural basis, we need not review the testimony of each witness with any specificity. This reasoning applies to the specific testimony the parties offered on each of the eight hearing dates.

**18.** A "porte cochere" is "roofed structure extending from the entrance of a building over an adjacent driveway and sheltering those getting in or out of vehicles." Webster's Collegiate Dictionary 907 (10th ed.1993).

**19.** The record does not indicate whether the Board of Appeals independently notified Concerned Citizens regarding its receipt of the additional exhibits.

Thereafter, on 30 July 1996, the Board of Appeals conducted the third day of hearings, during which Constellation offered three witnesses: Maryanne Eshelman of Hamlyn Senior Marketing, Ann Gardner of Constellation Senior Services, and Bob Morris, a transportation planning consultant.

On 6 September 1996, Constellation offered another Motion to Amend the Petition. Therein, Constellation submitted the following exhibits for the Board's consideration:

1. Revised Site Analysis.

2. Revised Falls Road Elevation and Revised MacArthur Boulevard Elevation.

3. North Facade Elevation and Easterly Facade Elevation.

4. Revised Special Exception Site Plan.

5. Revised Special Exception Planting/Forest Conservation Plan.

In addition, Constellation set forth a list of persons it expected to testify at the 17 September 1996 hearing. The letter indicated that Constellation sent the letter and the amended exhibits to Concerned Citizens' attorney by messenger. On 6 September 1996, the Board of Appeals filed a Notice of Receipt of Additional Exhibits and sent that notice to, among others, Concerned Citizens' attorney.

At the 17 September 1996 hearing, the fourth hearing date, Constellation presented four witnesses: Richard Morris, who testified about the revised design of the Residence; John Sekerak;[20] Phil Perrine, who offered general comments as to his review of Constellation's revisions; and Ryland Mitchell, a real estate appraiser and consultant. At the conclusion of the hearing, Constellation had completed its case-in-chief.

---

**20.** We are uncertain as to the nature of Mr. Sekerack's testimony because the transcript from the 17 September 1996 hearing included in the record is missing pages 107–130, where the bulk of his testimony is contained. Again, this omission is of no fatal consequence because when rendering our decision in this case, we do not rely on the factual testimony offered before the Board of Appeals.

On 1 October 1996, Concerned Citizens commenced its case. Therein, the following witnesses testified on behalf of the community and in opposition to the special exception: Hibbard Paine, a long-time resident of the immediate area of the project; Margaret and Robert Dennis, adjacent property owners; Robert Wilkoff, a licensed architect; and Elmer Hewlin, a long-time resident of the area.

At the beginning of Mr. Wilkoff's testimony, Mr. Wilkoff stated that he had prepared exhibits to accompany his testimony. These exhibits included computer-generated pictures, which Concerned Citizens proffered accurately represented how the project would look from different vantage points, including from the park entrance and from the Dennises' home. Apparently, Constellation received these exhibits five minutes before Mr. Wilkoff began his testimony. Constellation moved to exclude these exhibits, citing the Board of Appeals's rule requiring that exhibits be submitted within ten days of the hearing.[21] In response, Concerned Citizens argued that it did not offer these exhibits in order to propose a new design; instead, Concerned Citizens argued that it offered these exhibits in order to rebut and comment on Constellation's revised plan.

One of the members of the Board of Appeals, William Green, responded with the following comment:

Well, certainly Mr. Dugan [Constellation's attorney] is entitled to at least ten days. There's just no question in my mind that he's entitled to at least ten days to review the material. I mean it would [be] absolutely unfair to ask him to cross examine on material he just saw this afternoon.

 \* \* \* \* \* \*

---

21. Constellation's reference to the ten-day rule seems to implicate section 59–A–4.24, which requires the applicant to give ten days' notice to all interested parties of any motion to amend the petition. This rule, however, technically does not apply to the opposition's submission of exhibits. Instead, Rule 5.0(c) of the Board of Appeals Rules of Procedure, Montgomery County Code, Appendix J (1997), applies. Rule 5.0(c) provides: "[O]n motion by any party, or by the Board, [the Board has the power to] introduce into the record documentary or other evidence, provided that all parties are given reasonable notice."

But he has to have an opportunity to take measurements of—I think it would be very unfair to have him cross examine on something that he hasn't seen before. You'd raise the same question Mr. Knopf [counsel for Concerned Citizens].

Helen Strang, the Chair of the Board of Appeals, commented: "Pictures, I think, in this case can be quite complicated. I think ... this kind of thing ... is probably more complicated than a site plan...." In addition, Allison Bryant, a member of the Board, stated:

I'm suggesting Madam Chair, that ... if anyone had come in like this and said this is a rendering that counters the changes that's being presented and we are introducing it for the first time we would not honor it. We would say provide an opportunity for the applicant or if it's the—even when the applicant does it and the opposition doesn't have a chance we always push to make sure that the opposition has a chance to respond rather than responding on site at that time.

If that's the case as I recall it and I'm suggesting that the applicants also have an opportunity to receive this information and to prepare a response for it.

The Board of Appeals ultimately concluded that while Concerned Citizens could not introduce the actual exhibits during the course of the 1 October 1996 hearing, Mr. Wilkoff could testify verbally about the contents of the exhibits. The Board stated that Concerned Citizens could introduce the physical exhibits after Constellation had the opportunity to examine them. Chairman Strang additionally stated that Constellation need not be prepared to discuss the computer-generated pictures at the following day's hearing because "that seems like a very pressurized situation;" instead, Ms. Strang stated that Constellation should be prepared to discuss them within a "reasonable" amount of time. Ultimately, Concerned Citizens introduced, and the Board received, the exhibits during the course of the 25 November 1996 hearing.

On 2 October 1996, the Board of Appeals conducted a fifth day of hearings, during which the primary witnesses were Robert and Margaret Dennis. On 11 October 1996, the Board of Appeals received a letter from Constellation's attorney enclosing two documents that it expected its witness, James Hendricks, to address at the next scheduled hearing on 22 October 1996. The documents were: (1) a 22 March 1996 letter from the Montgomery County Department of Environmental Protection approving a Stormwater Management Concept Plan; and (2) Runoff Summary Table indicating the improvement to the stormwater runoff conditions. Constellation's attorney stated that he sent copies, via facsimile, of the documents to Concerned Citizens' attorney. On 22 October 1996, the Board conducted the sixth day of hearings, in which the following individuals, among others, participated: counsel for Constellation, counsel for Concerned Citizens, Margaret Dennis, and Robert Dennis.

### *The 25 November 1996 Hearing: The Lead-up and the Day-of*

By letter dated 23 October 1996 and received by the Board of Appeals on 24 October 1996, Constellation submitted the resume of Jon M. Grant of Grant–WTW Architects for the purpose of having him admitted at the 25 November 1996 hearing as an expert architect with expertise in CADD[22] Visioning and Animation. The letter stated that Mr. Grant would assist Richard Morris at the hearing with the presentation of an animated tour of the property along Falls Road and MacArthur Boulevard and would assist in the presentation of still virtual photographs from certain locations around the site and from certain neighboring yards. The letter indicated that Constellation sent this letter, by facsimile, to Concerned Citizens.

In response, by letter dated 24 October 1996 and received by the Board of Appeals on 28 October 1996, Concerned Citizens questioned the appropriateness of allowing Constella-

---

**22.** "CADD" is an acronym for computer-aided drafting and design.

tion to add a witness at this time. Concerned Citizens further noted that the letter referred to Mr. Grant's use of virtual photographs at the hearing, but that as far as Concerned Citizens was aware, Constellation had provided neither them, nor the Board, with a copy of these exhibits. Concerned Citizens stated:

Section 59–A–4.22(a)(9)[23] of the Montgomery County Code, and Rule 1.9 [24] of the Board's Rules provide that the applicant is to submit all exhibits at least 60 days prior to the hearing. The Board may shorten this time for a good reason, upon written request of the applicant, to 30 days before the hearing.

In an effort to cooperate with the applicant, we are prepared to shorten this time further. However, at a minimum, we need the applicant's exhibits no later than Friday, November 8, 1996, in order to properly prepare a response. If our response requires our own new exhibits, this shortened time period will not permit sufficient opportunity to provide the applicant copies of the responding exhibits ten days prior to the hearing. Accordingly, if the Board permits the applicant's exhibits, we request that it be with the condition that if the exhibits are provided to the opponents less than 30 days in advance of the hearing, the applicant will be deemed to have waived any objection to not receiving our responding exhibits at least ten days before the hearing.

---

**23.** We assume that Concerned Citizens intended to refer to section 59–A–4.22(a)(10), which provides that "[e]ach petition for special exception must be accompanied at the time of its filing by 4 copies of a statement that includes ... (10) All additional exhibits which the petitioner intends to introduce," rather than to section 59–A–4.22(a)(9), which refers to the submission of a water quality plan.

**24.** We also assume that Concerned Citizens intended to refer to Rule 1.2 of the Board's Rules of Procedure, which states that "[t]he information required by section 59–A–4.22 must be filed with the completed application form at least 60 days before the hearing date. The Board may expedite a hearing for a special exception to 30 days before the hearing date," rather than to Rule 1.9, which sets for the requirements for sign posting.

The letter indicated that Concerned Citizens sent this letter via facsimile and mail to Constellation's attorney.

On 8 November 1996, the Board of Appeals received a letter from Constellation's attorney enclosing exhibits that Constellation planned to use at the 25 November 1996 hearing. The enclosed exhibits included one VHS videotape containing a computer-generated animation of the project/site (including how it would look with 10 years of landscape growth) and twelve computer-generated perspectives of the site from the following vantage points:

1. Great Falls Entrance View—Landscaping at installation (summer foliage).

2. Great Falls Entrance View—Landscaping at 10 year growth (summer foliage).

3. MacArthur Boulevard View—Landscaping at installation (summer foliage).

4. MacArthur Boulevard View—Landscaping at 10 year growth (summer foliage).

5. Dennis Residence View—Landscaping at installation (summer foliage).

6. Dennis Residence View—Landscaping at 10 year growth (summer foliage).

7. East View—Landscaping at installation (summer foliage).

8. East View—Landscaping at 10 year growth (summer foliage).

9. Fawsett Road View—Landscaping at installation (summer foliage).

10. Fawsett Road View—Landscaping at 10 year growth (summer foliage).

11. Falls Road View—Landscaping at installation (summer foliage).

12. Falls Road View—Landscaping at 10 year growth (summer foliage).

The letter indicated that Constellation sent, by messenger, a copy of the letter and the exhibits to Concerned Citizens' attorney.

On 11 November 1996, the Board of Appeals received an additional letter from Constellation's attorney enclosing exhibits Constellation planned to use at the 25 November 1996 hearing. The enclosed exhibits were six computer-generated perspectives of the following views of the site:

1. Great Falls Entrance View—Landscaping at 5 year growth (winter foliage).

2. MacArthur Boulevard View—Landscaping at 5 year growth (winter foliage).

3. Dennis Residence View—Landscaping at 5 year growth (winter foliage).

4. East View—Landscaping at 5 year growth (winter foliage).

5. Fawsett Road View—Landscaping at 5 year growth (winter foliage).

6. Falls Road View—Landscaping at 5 year growth (winter foliage).

The letter indicated that Constellation sent, by messenger, a copy of the letter and the exhibits to Concerned Citizens' attorney.

On 13 November 1996, the Board of Appeals received another letter from Constellation's attorney describing and enclosing an exhibit Constellation planned to use at the 25 November 1996 hearing. The exhibit was a videotape of a computer-generated drive-by view of the project/site proceeding from MacArthur Boulevard to Falls Road. The letter indicated that the landscaping shown in the videotape reflects how it would appear at the time of planting. The letter also indicated that Constellation sent, by messenger, a copy of the letter and the videotape to Concerned Citizens' attorney.

On 25 November 1996, the Board of Appeals held its eighth day of hearings in this matter. The following witnesses testified: Robert Wilkoff, Concerned Citizens' architect; six

neighbors, Joe Gunn, Bonnie Barker, Klaus Mehlhorm, Alan Wolfe, Richard Lyschik, Kay Chung; and Richard Morris, Constellation's architect. At the beginning of the hearing, Chairman Strang stated that that day's hearing would be the final day of hearings in this matter, and that the Board would vote on the special exception the following day, stating that "we cannot saddle a new Board member with reading this record." [25] When Board Member Green stated "[i]t has something to do with cruel and unusual punishment," Chairman Strang responded: "Punishment, right, yes, so that it just has to be finished up with this batch. Okay. All right." Following these comments, the hearing commenced.

Concerned Citizens first called Mr. Wilkoff. Before Mr. Wilkoff began his testimony, Concerned Citizens offered as evidence the computer-generated pictures the Board of Appeals previously excluded on 1 October 1996.[26] Mr. Wilkoff utilized these exhibits during the course of his testimony regarding the impact of the project on the National Park, the Dennis home, and the surrounding area.

After Concerned Citizens closed its case, Constellation called its architect, Richard Morris, to testify as a rebuttal witness with respect to how the design and bulk of the project fits in with the surrounding neighborhood. Constellation's attorney noted that "[i]n order to do so he will testify as to some additional exhibits." The additional exhibits included the videotape containing a computer-generated animation of the project/site (with ten years of landscape growth) and

25. Apparently, the term of one of the Board members expired shortly after 25 November 1996.

26. Constellation, in its appellate brief, notes that three of the exhibits that Concerned Citizens introduced on 25 November 1996 were different from those exhibits Concerned Citizens initially offered on 1 October 1996. The record indicates that Concerned Citizens prepared or corrected two of the 1 October 1996 exhibits during the weekend before the 25 November 1996 hearing, including Concerned Citizens' attorney's comment that one of the computer-generated views of the Dennis home was "done over the weekend," and his comment that one of the exhibits contained a handwritten correction to the wording on the exhibit (changing the words "second floor" to "first floor").

computer-generated pictures reflecting six views of the project in three different time periods and different seasons (summertime planting, five year growth shown in the winter, ten year growth shown in the summer).[27] Because Concerned Citizens had received copies of these exhibits on 8 November 1996, it offered no objection to the admission of these exhibits at the hearing.[28]

Later in the course of Mr. Morris' testimony, however, Constellation's attorney stated that, in order to address the impact the rear of the proposed building would have on the Dennises' property, Constellation had agreed to shorten the wing of the building closest to the Dennises' property (the east wing) by twenty feet. The following dialogue then ensued:

[Concerned Citizens' attorney]: Excuse me. I'm going to have an objection to this. This is yet another revision—

[Constellation's attorney]: I think I'm allowed to finish my sentence.

[Concerned Citizens' attorney]: No, because I do not think this is proper to bring to the Board's attention, yet another revision—

[Constellation's attorney]: Okay.

[Concerned Citizens' attorney]: —which we were provided the details of on Sunday, yesterday.

[Constellation's attorney]: Let me proffer what I am going to offer and then you may object. The proffer is to show

---

**27.** The eighteen specific exhibits (six views, three time periods) are enumerated above in the context of the letters Constellation's attorney sent to the Board and to Concerned Citizens on 8 November 1996 and 11 November 1996.

**28.** At the hearing, Concerned Citizens' attorney asked Constellation's attorney whether the items offered as exhibits on 25 November 1996 were those exhibits he received from Constellation on 8 November 1996. Constellation's attorney stated that these exhibits, in fact, were those that he delivered to Concerned Citizens on 8 November 1996. We note, however, based on the two letters Constellation submitted to the Board on 8 and 11 November 1996, *see supra*, that Concerned Citizens, at the earliest, received six of the exhibits on 11 November 1996.

the Board a shorter wing closer to the Dennises and heavier landscaping in the rear of the property near the Dennises. That's my proffer.

[Chairman] Strang: We hear Mr. Knopf's [Concerned Citizens'] objection and I'm going to let you go ahead and show it to us.

[Concerned Citizens' attorney]: Well I think it's—

[Chairman] Strang: I hear what you're saying Mr. Knopf, but this is—

[Concerned Citizens' attorney]: All right. Well, I just—

[Chairman] Strang: This is an effort to make an improvement and I think we have done it—allowed many other applicants to do it and I intend to allow this one.

[Concerned Citizens' attorney]: All right. Well, I'm not going to—obviously argue with the Chair. I will adhere to the Chair's ruling, but I would like to place on the record that we do object. We are prejudiced in that your normal rule are some 30 days. We need an opportunity now which we have not had to put this into the computer, to come back and to make our comment. That's—we were just notified of this yesterday and we do need that. Now, obviously we would be greatly prejudiced if this were to be approved on the ground that the Board felt this modified it in some way to make it compatible and we haven't had an opportunity to then respond. I just want to place that on the record. . . .

The Board then asked Constellation two additional questions: First, the Board asked whether the twenty foot reduction in the length of one of the wings would result in any additions elsewhere. Constellation responded that the wing reduction would result in a reduction of the building's square footage.[29] Second, the Board asked whether and when Con-

---

29. During the course of Mr. Morris's testimony, he stated that shortening the wing by twenty feet would have the effect of diminishing the number of units by six—from seventy-eight units to seventy-two units. Mr. Morris stated that pursuant to Constellation's request, he planned to try to add the units to a different, as of yet unspecified, location within the building, but he was unsure as to how many of the units he

stellation offered Concerned Citizens information about Constellation's latest plans to revise its petition. The parties agreed that Constellation first contacted Concerned Citizens regarding these revisions to the petition on Thursday, 21 November 1996, four days before the 25 November 1996 hearing. Concerned Citizens' attorney, however, was unable to meet with Constellation's attorney to receive the new exhibits until Sunday, 24 November 1996, one day before the hearing. Following this discussion, Constellation's attorney stated:

> I might also remind the Board that many photographs and the like that Mr. Knopf submitted today I have never seen before and so— ... —I would also note that you've made exceptions in those cases here. Given the fact that the building is now smaller, further away from the Dennises, with additional landscaping, it's difficult for me to see how the Dennises can be prejudiced by that. And may I continue?

The Board then allowed Constellation's attorney to introduce new exhibits depicting the nature of Constellation's proposed revisions to its petition.

Constellation first introduced the following four exhibits:

1. A revised site analysis, indicating, among other things, a reduction in the square footage of the building by 3,000 square feet.

---

would be able to add. Constellation's attorney then asked if it could maintain its request for seventy-eight units, the number of units requested in the petition, despite the fact that ultimately, the building may contain a lower number of units. The Board agreed, and Concerned Citizens' attorney objected, arguing that the Board, by granting Constellation's request, violated the Board's requirement that the petitioner set forth certain information in its petition so that the other side will have knowledge of it and the ability to comment on it. We note that neither section 59–A–4.22 of the Zoning Ordinance (setting forth the data that must accompany a petition for a special exception) nor section 59–G–2.37 of the Zoning Ordinance (setting forth the requirements specifically applicable to special exceptions for nursing or care homes) requires the petitioner to submit detailed plans regarding the interior layout of the proposed special exception.

2. A summary describing additional landscaping Constellation planned to provide in the rear of the property including approximately fifteen new trees of various varieties.[30]

3. A revised site plan in which the Residence wing closest to the Dennises' property was shortened by twenty feet.

4. A revised planting and forest conservation plan showing additional landscaping intended more effectively to screen and buffer the Residence from the Dennis home.

These exhibits modified the site plan and the planting/forest conservation plan Constellation submitted on 6 September 1996. In addition to the aforementioned exhibits, Constellation introduced a foam board poster containing three enlarged computer-generated stills of the Residence, as viewed from the second level of the Dennis residence, with the revised landscaping depicted at installation (summer foliage), in five years (winter foliage), and in ten years (summer foliage).[31]

---

**30.** The additional planting included the following trees:

| Quantity | Common Name | Height |
|---|---|---|
| 3 | Heritage River Birch | 10–12' |
| 6* | Eastern White Pine | 16–18' |
| 2 | Loblolly Pine | 5–6' |
| 2 | Willow Oaks | |
| 3 | October Glory Maples | |
| 2 | Service Berry | 5–6' |

 * Note: Two white pines will replace 2 5–6' loblolly pines in the previous plan. All other plantings are in addition to the previous plan.

**31.** Constellation, in its appellate brief, states that the foam board contains three enlarged stills of the view of the project from the Dennis residence, the East View, and the Fawsett Road view. Based on our review of the computer-generated stills provided in the record extract, however, we note that the enlarged stills on the foam board are instead three different pictures of the view of the project from the Dennis Residence (second level) with each picture representing a different time period (installation in the summer, five year in the winter, and ten year in the summer). The title on the foam board that appears above the three pictures stating "The Residence at Great Falls; View from the Dennis Residence (Second Level)," and the individual designations next to each picture stating "Installation (Summer)," "5 Year (Winter)," and "10 Year (Summer)," further confirm our assessment of the enlarged stills.

These stills were enlarged from three of the computer-generated pictures that Constellation provided Concerned Citizens on 8 and 11 November 1996. In conjunction with the posterboard, Constellation also introduced a mylar overlay for the posterboard demonstrating the effect of the additional landscaping on the view of the Residence from the Dennis property. The mylar overlay contained a number of hand-drawn trees consistent with the trees described in the new landscape summary.

Mr. Morris, in the course of his testimony, utilized the new exhibits, particularly the mylar overlay, to describe how the additional landscaping and the shortening of the wing closest to the Dennis home by twenty feet would diminish the impact of the project on the Dennises' property. After Constellation questioned Mr. Morris, Concerned Citizens' attorney cross-examined him. During the course of the cross-examination, Concerned Citizens' attorney asked Mr. Morris, among other things, about the additional tree planting proposed in the revised planting and forest conservation plan, and the effect those plantings assertedly would have on the Dennis home. He did not question Mr. Morris about the effect, negative or positive, of the proposed twenty foot reduction of the wing closest to the Dennis home. Following Mr. Morris's testimony, the parties gave their closing arguments; Concerned Citizens did not recall its architect, Mr. Wilkoff, to testify as a rebuttal witness.

At the conclusion of the hearing, the Board closed the record. Chairman Strang then reiterated the fact that the Board would vote on the petition the next day. Concerned Citizens, at this time, did not raise any additional objection to the Board's decision to close the record.

### Subsequent Procedure: The Board of Appeals and Circuit Court Decisions

On 3 December 1996, by a vote of three to two, the Board of Appeals granted Constellation's special exception petition sub-

ject to thirteen specific conditions, including the following condition: [32]

> 5. The holder of the special exception will submit a revised landscaping and lighting plan to the Board of Appeals. The plan will reflect discussions with the neighbors on Fawsett [sic] Road, and modifications to improve the buffering and screening of the building. The plan should reflect additional evergreen screening and deciduous plants both within the setback area and the public right-of-way along MacArthur Boulevard and Falls Road, if permitted by the County, the State and/or the Army Corps of Engineers. The plan should also reflect additional evergreen screening along the northern and eastern property lines adjacent to the parking and building area.

> Technical staff will have participated in these discussions and will have reviewed and approved the plan. After the Board reviews and accepts the revised plan in a worksession, the holder of the special exception will submit one copy to the Zoning Supervisor in the Department of Permitting Services. All plant material must be installed according to plan and maintained and replaced as necessary.

On 13 December 1996, Concerned Citizens filed a Request for Reconsideration with the Board of Appeals. By resolution dated 18 December 1996 and effective 31 December 1996, the Board of Appeals denied Concerned Citizens' request.

Concerned Citizens, on 2 January 1997, then filed a Petition for Judicial Review in the Circuit Court for Montgomery County. Constellation filed a response, and Montgomery County first filed a Motion to Intervene, and then filed a response. The circuit court held a hearing in this matter on 26 June 1997. At the conclusion of the hearing, the court delivered an oral ruling from the bench affirming the Board's decision to approve the special exception for the care home.

---

32. Three board members, Susan Turnbull, Helen Strang, and Allison Bryant, voted in favor of granting Constellation's special exception, while two board members, William Green and Donna Barron, opposed the special exception.

The court filed a written order adopting its oral ruling on 16 July 1997, and on 14 August 1997, Concerned Citizens filed this appeal.

## DISCUSSION

### Standard of Review

We initially note the relevant standard of review. Article 28, section 8–110 of the Maryland Code (1957, 1997 Repl.Vol., 1997 Supp.) (the Regional District Act) sets forth the roles of the circuit court and of ourselves in reviewing a decision of the Montgomery County Board of Appeals regarding an application for a special exception under the Montgomery County zoning ordinance. Section 8–110 provides in pertinent part:

> (b) *Appeals in Montgomery County.*—In Montgomery County, notwithstanding any provision in Article 25A, § 5(U), of the Annotated Code [33] to the contrary, a decision by the county board of appeals on applications for zoning variations or exceptions may be appealed within 30 days by any person, municipality, corporation, or association, whether or not incorporated, which has appeared at the hearing in person, by attorney, or in writing, to the circuit court for the county, which may affirm or reverse the decision appealed from or remand it to the board for further consideration for any reason, or dismiss the appeal as provided by law. Any party to the proceeding in the circuit court aggrieved by the decision of the said court may appeal from such decision to the Court of Special Appeals. The review proceedings provided by this subsection shall be exclusive.

*See also Council of Chevy Chase View v. Rothman*, 323 Md. 674, 685, 594 A.2d 1131 (1991) (noting that the Regional District Act is "now the exclusive source of zoning authority in Montgomery County and that any enactment concerning zon-

---

**33.** Article 25A, section 5(U) of the Maryland Code (1957, 1998 Repl. Vol.) addresses the enumerated powers of County Boards of Appeal, including the roles of the circuit court and the Court of Special Appeals in reviewing a Board of Appeals decision in a charter county.

ing in the county, which is at variance with the Regional District Act, is inoperative within the district").

In addition to the foregoing, a reviewing court is not constrained to affirm an administrative decision " 'which is premised solely upon an erroneous conclusion of law.' " *Younkers v. Prince George's County*, 333 Md. 14, 19, 633 A.2d 861 (1993) (quoting *People's Counsel v. Maryland Marine*, 316 Md. 491, 496–97, 560 A.2d 32 (1989)); *accord Gray v. Anne Arundel County*, 73 Md.App. 301, 308, 533 A.2d 1325 (1987).

■■ In this appeal, Concerned Citizens raises three questions of law; as such, this Court's review " 'is expansive, that is, the appellate court may substitute its judgment for that of the [administrative agency].' " *Gray*, 73 Md.App. at 309, 533 A.2d 1325 (quoting *Thames Point Associates v. Supervisor*, 68 Md.App. 1, 9, 509 A.2d 1207 (1986)). Our role "is essentially to repeat the task of the circuit court; that is, to be certain the circuit court did not err in its review." *Mortimer*, 83 Md.App. at 442, 575 A.2d 750; *accord Anne Arundel County v.2020C West Street, Inc.*, 104 Md.App. 320, 326, 656 A.2d 341 (1995). With these principles in mind, we turn to the case at hand.

I.

Concerned Citizens first contends that the Board of Appeals violated its own procedural rules and the Zoning Ordinance when it permitted Constellation to revise its petition and submit additional exhibits on 25 November 1996, the final hearing date, but denied Concerned Citizens' request for additional time to respond to the revisions and exhibits and closed the record at the conclusion of the hearing, despite the Board's knowledge that Concerned Citizens first viewed the exhibits embodying the revisions on the Sunday before the hearing. The revisions [34] Constellation introduced on 25 No-

---

**34.** Constellation never disputes the fact that it attempted to revise its petition on 25 November 1996. Instead, Constellation claims that the Board properly admitted these revisions based on the nature of the revisions, i.e., that they were minor and patently beneficial to Concerned Citizens, and on the fact that the Board possessed the power

vember 1996 ["the 25 November 1996 revisions"] were: (1) a twenty foot reduction in the length of the east wing of the Residence resulting in a three thousand square foot reduction in the overall square footage of the building and (2) additional landscaping on the side of the Residence closest to the Dennises' home. Constellation introduced the following additional exhibits embodying those revisions ["the 25 November 1996 exhibits"]: (1) a revised site analysis; (2) a summary of the additional landscaping; (3) a revised site plan; (4) a revised planting and forest conservation plan; and (5) a mylar overlay used in conjunction with previously admitted, enlarged computer-generated pictures of the view of the Residence from the Dennis home.

Concerned Citizens advances several arguments in favor of its position: first, Constellation gave Concerned Citizens only one day of notice regarding the revisions and exhibits and therefore the Board's acceptance of those revisions and exhibits on the final hearing date violated the ten day notification requirement in section 59-A-4.24 of the Zoning Ordinance and the reasonable notice requirement in Rule 5.0(c) of the Board of Appeals Rules of Procedure, Montgomery County Code, Appendix J; second, the Board violated Rule 7.2.6 when it closed the record at the end of the hearing; third, the Board violated section 59-A-4.48(c) of the Zoning Ordinance when it failed to leave the record open for a reasonable time following Constellation's last revisions in order to allow the Planning Board or its staff to comment on the revisions; fourth, the Board's failure to grant Concerned Citizens additional time to respond to the revisions and additional exhibits constituted prejudicial error; and fifth, even if Concerned Citizens failed to demonstrate prejudice, pursuant to the *Accardi* doctrine, the Board's violation of its own procedural rules mandates reversal. *See Board of Educ. v. Ballard,* 67 Md.App. 235, 240, 507 A.2d 192 (1986).

---

both to grant motions to amend and to allow any party to introduce evidence into the record provided that all other parties have reasonable notice of that evidence.

In response, Constellation argues the following: first, Constellation gave Concerned Citizens "adequate time to review" the revisions and exhibits, and therefore, the Board did not violate its own procedures; second, even if the Board did violate its own procedures, the Board has the power to waive minor defects or errors that do not affect the substantive rights of the parties; third, Concerned Citizens suffered no prejudice as a result of the revisions, therefore any Board violation of the procedural requirements constituted harmless error; fourth, Concerned Citizens did not object when the Board closed the record, therefore, the issue is not preserved; and fifth, even if the issue is preserved, failure to leave the record open for comments from the Planning Board does not constitute prejudicial error.

We initially review the relevant provisions of the Zoning Ordinance. Section 59–A–4.2 sets forth the provisions one must follow in order to file, amend, or withdraw a petition for a special exception. Specifically, section 59–A–4.22 mandates:

(a) Each petition for special exception must be accompanied at the time of its filing by 4 copies of a statement that includes:

(1) Survey plats or other accurate drawings showing boundaries, dimensions, area, topography and frontage of the property involved, as well as the location and dimensions of all structures existing and proposed to be erected, and the distances of such structures from the nearest property lines.

(2) Plans, architectural drawings, photographs, elevations, specifications or other detailed information depicting fully the exterior appearance of existing and proposed construction, including signs, involved in the petition. This requirement may be satisfied by site plan documents. . . .

\* \* \* \* \* \*

(4) Complete information concerning the size, type and location of any existing and proposed trees, landscaping and screening of any exterior illumination proposed.

> This requirement may be satisfied by site plan documents....

> \* \* \* \* \* \*

> (10) All additional exhibits which the petitioner intends to introduce.

Montgomery County Code, Chapter 59 (Zoning Ordinance), § 59–A–4.22 (1997). Section 59–A–4.24 sets forth the process by which the petitioner can amend a petition:

> An applicant may amend this statement prior to the hearing, upon consent of the board, following a motion to amend and 10 days' notice thereof to all parties entitled to original notice of filing. Amendments that are found by the board to alter materially a petitioner's proposal or evidence are cause to postpone the hearing to a date that permits all interested parties, including but not limited to public agencies, adequate time to review the amendment. The amendment must also be referred to the planning board, in accordance with subsection 59–A–4.48(c). Nothing in this section prohibits the board, during the hearing or at any time before the record is closed, from requesting the applicant to revise any aspect of the proposal.

*Id.* § 59–A–4.24.

Section 59–A–4.4 sets forth the provisions governing public hearings on petitions and appeals. Section 59–A–4.41 provides in pertinent part that "in the case of any petition for grant of special exception [the Board may not hold a hearing] sooner than 60 days following the mailing of the notice of the filing of the petition." *Id.* § 59–A–4.41(b)(1). Included among those entitled to notice of filing are "the owners, as specified by the applicant at the time of filing, of all properties: (A) contiguous to the property with which the case is concerned, and (B) opposite the property measured at right angles to the intervening street or streets." *Id.* § 59–A–4.46(a)(5). In addition, section 59–A4.48(c) sets forth the provisions regarding the Planning Board report and recommendation and provides in part:

(a) The county planning board or its technical staff must submit a report reviewing any petition for a special exception to the board at least 5 working days prior to the date set for the public hearing. . . .

> \* \* \* \* \* \*

(c) After the planning board or its technical staff has issued its initial report and recommendation, the applicant must transmit to the planning board a copy of any subsequent amendment to the petition. The record must remain open for a reasonable time to provide an opportunity for the planning board or its staff to comment. Within that time, the planning board or its staff must comment on the amendment or state that no further review and comment are necessary.

*Id.* § 59–A–4.48(a), (c).

We additionally set forth relevant portions of the County Board of Appeals Rules of Procedure. Rule 5 describes the powers the Board of Appeals may exercise, including the following:

(b) on motion by any party, or by the Board, dispose of procedural requests, including but not limited to the following motions: to amend, to consolidate applications or petitions, or to reopen the record of any case in order to receive additional evidence or information;

(c) on motion by any party, or by the Board, introduce into the record documentary or other evidence, provided that all parties are given reasonable notice;

> \* \* \* \* \* \*

(f) waive minor procedural defects or errors that do not affect substantive rights of the parties in order to proceed on the merits. . . .

Rule 7.2.6 sets forth information regarding the Board's procedure for closing the record at the conclusion of a hearing:

As a rule the record is closed at the end of a hearing. The Board will hold the record open for at least 15 days after the conclusion of a hearing if:

a. the Planning Board or planning staff submit a report on the application less than 5 days before the hearing date;

b. an amended application is filed less than 10 days before the hearing or during the hearing; or

c. other circumstances occur to justify holding the record open at the Board's discretion.

We conclude that the Board, by accepting Constellation's revisions and additional exhibits on 25 November 1996, violated sections 59–A–4.24 and 59–A–4.48(c) of the Zoning Ordinance and Board of Appeals Rules of Procedure 5.0(c) and 7.2.6(b). We further conclude that the Board's decision to deny Concerned Citizens request for additional time to review these revisions and exhibits prejudiced Concerned Citizens, and on this basis, we vacate the judgment of the circuit court and remand the case to the circuit court with instructions that the court return the case to the Board of Appeals for the purpose of allowing Concerned Citizens a reasonable opportunity to respond to Constellation's revised petition.

## A.

We first explain why we conclude that the Board's actions on 25 November 1996 violated sections 59–A–4.24 and 59–A–4.48(c) and Rules 5.0(c) and 7.2.6(b). We briefly review the facts relevant to our conclusion. Throughout the course of the special exception approval process, each time Constellation wished to amend its petition, it filed with the Board of Appeals a "Motion to Amend the Petition." In total, prior to 25 November 1996, Constellation filed six motions to amend the petition.[35] The face of each motion stated that Constellation filed its motion pursuant to section 59–A–4.24, and with the exception of one motion to amend that Constellation submitted seven days in advance of the next Board hearing,[36] Constella-

---

**35.** Constellation filed its motions on the following dates: 22 January 1996, 29 February 1996, 11 March 1996, 28 May 1996, 28 June 1996, and 6 September 1996.

**36.** Constellation filed its fourth motion to amend on 28 May 1996, seven days before the third hearing date. As discussed *infra*, one of the

tion filed each amendment more than ten days in advance of the next hearing (the Board conducted hearings on 27 March 1996, 4 June 1996, 30 July 1996, 17 September 1996, 1 and 2 October 1996, 22 October 1996, and 25 November 1996). Furthermore, after Constellation filed each motion, Concerned Citizens received notice either from the Board, in the form of a Notice of Receipt of Additional Exhibits, or directly from Constellation.[37] Thus, up until the 25 November 1996 hearing date, Constellation had essentially complied with the section 59–A–4.24 requirement to provide Concerned Citizens with ten days notice of any revisions to the petition.

In addition, between the sixth hearing date, 22 October 1996, and the final hearing date, 25 November 1996, Constellation generated a number of additional exhibits that it planned to introduce at the hearing. Concerned Citizens first learned of these additional exhibits when it received a copy of a letter sent to the Board, dated 23 October 1996, in which Constellation submitted the resume of an additional witness it planned to produce on 25 November 1996 and stated that at the hearing this witness would assist its expert architect witness with the presentation of still virtual photographs of the proposed use as revised. After Concerned Citizens, on 28 Octo-

---

reasons the Board's violation of the ten-day notification rule constituted prejudicial error was the fact that the Board did not provide Concerned Citizens with an adequate amount of time to prepare its response to the revisions and additional exhibits. Although the fact that Constellation submitted a Motion to Amend seven days before the third hearing date also constituted a violation of section 59–A–4.24, this violation is inherently less prejudicial because Concerned Citizens had several other opportunities to respond to such revisions. In any event, neither party raises this issue for our consideration, therefore, we will not consider it in this appeal. *See* Md. Rule 8–504(a)(5) ("A brief shall contain the items listed ... (5)[a]rgument in support of the party's position."); *see also Ricker v. Abrams,* 263 Md. 509, 516, 283 A.2d 583 (1971) (holding that when appellant did not raise an issue in her brief or in her argument before the Court, the issue is considered waived).

37. Commencing with its 28 May 1996 Motion to Amend the Petition, within each subsequent motion, Constellation indicated that it sent copies of its motions and additional exhibits to Concerned Citizens' attorney.

ber 1996,[38] sent the Board a letter stating that Constellation had not provided either the Board or Concerned Citizens with copies of these photographs, Constellation, on 8 and 11 November 1996, sent the Board and Concerned Citizens copies of additional exhibits it planned to use at the 25 November hearing.[39] These exhibits included eighteen computer-generated photographs of the property taken from different vantage points and reflecting different seasons and time frames and a VHS videotape containing a computer-generated animation of the project. Concerned Citizens did not object to the admission of these exhibits at the hearing.

In contrast to Constellation's prior consistent practice of notifying the Board and Concerned Citizens about revisions and additional exhibits at least ten days prior to the next hearing date, Constellation did not provide Concerned Citizens with either ten days' notice of its 25 November 1996 revisions or advance notice that it planned to introduce additional new exhibits on 25 November 1996. The parties agree that Constellation first contacted Concerned Citizens regarding the 25 November 1996 revisions to the petition on Thursday, 21 November 1996. The parties also agree that they did not meet to discuss Constellation's revisions until Sunday, 24 November 1996.[40] During that meeting, Constellation provided Concerned Citizens with copies of the exhibits it planned to introduce at the hearing.[41] Thus, at best, Constellation noti-

---

**38.** Concerned Citizens' letter was dated 24 October 1996, but the Board actually did not receive the letter until 28 October 1996.

**39.** We note that these exhibits did not constitute revisions to the petition, and therefore were not subject to the ten-day rule set forth in section 59–A–4.24. They are subject, however, to the Rule 5.0(c) requirement that all parties receive "reasonable notice" of evidence before the Board admits such evidence into the record.

**40.** Concerned Citizens' attorney testified that he would have met with Constellation on Friday, 22 November 1996, but that he was out of town with his wife for their thirtieth wedding anniversary. Consequently, he could not meet with Constellation's attorney until Sunday, 24 November 1996.

**41.** We learn from Concerned Citizens' appellate brief that Constellation provided Concerned Citizens with copies of the exhibits on 24 Novem-

fied Concerned Citizens that it planned to revise its petition four days in advance of the hearing, but Concerned Citizens did not actually view the revisions and the additional exhibits until one day before the hearing. Despite the Board's knowledge that Concerned Citizens had only one day physically to review the proposed revisions and exhibits, during the course of the 25 November 1996, the Board, over Concerned Citizens' objection, allowed Constellation to revise its petition and to introduce additional exhibits embodying those revisions.

The Board accepted Constellation's revisions and exhibits in the absence of any formal motion to amend or motion to introduce evidence. Instead, Constellation introduced its revisions during the testimony of its final witness, Mr. Morris. Therein, Constellation's attorney stated that Constellation, in order to address the impact of the Residence on the Dennises' home, had agreed to shorten the east wing of the building by twenty feet. At this point, Concerned Citizens' attorney objected on the ground that Constellation improperly was attempting to revise its petition. Constellation's attorney confirmed the fact that Constellation was offering revisions to its petition when he stated: "Let me proffer what I am going to offer and then you may object. The proffer is to show the Board a shorter wing closer to the Dennises and heavier landscaping in the rear of the property near the Dennises." In light of Constellation's proffer, the Board overruled Concerned Citizens' objection to the admission of the revisions and stated: "This is an effort to make an improvement and I think we have done it—allowed many other applicants to do it and I intend to allow this one."

Concerned Citizens' attorney then renewed his objection and argued that it needed more time to prepare its response to the revisions. The Board did not offer a direct response to Concerned Citizens' request; instead, the Board asked Constellation what impact the twenty foot reduction would have on

---

ber 1996. The record does not indicate, however, which exhibits Concerned Citizens received that day. Particularly, the record does not indicate whether Concerned Citizens viewed or was given a copy of the mylar overlay Constellation utilized at the hearing.

the rest of the building, and whether and when Constellation told Concerned Citizens that it planned to revise its petition. Constellation's attorney then stated: "Given the fact that the building is now smaller, further away from the Dennises with additional landscaping, it's difficult for me to see how the Dennises can be prejudiced by that." The Board then allowed Constellation to introduce five new exhibits embodying the revisions. Mr. Morris subsequently utilized these exhibits in the course of his testimony to describe how the additional landscaping and the shortening of the wing closest to the Dennises' home by twenty feet would diminish the impact of the Residence on the Dennises' property.

During cross-examination, Concerned Citizens' attorney questioned Mr. Morris about the additional tree planting set forth in the revised planting and forestation plan and about the effect those plantings would have on the Dennises' home. Concerned Citizens' attorney did not question Mr. Morris about the nature of the twenty foot wing reduction. At the conclusion of the hearing, the Board closed the record, and the next day, 26 November 1996, voted to grant Constellation's special exception petition.[42]

We conclude that the Board committed four procedural errors on 25 November 1996: First, the Board violated the ten-day notification rule set forth in section 59–A–4.24; second, the Board violated the "reasonable notice" requirement set forth in Rule 5.0(c); third, the Board violated Rule 7.2.6(b) when it closed the record on the final day of the hearing despite the fact it allowed Constellation to amend its petition; and fourth, the Board violated section 59–A–4.48(c) when it closed the record without allowing the planning board or its staff to comment on the new revisions.

1.

■ Section 59–A–4.24 provides: "An applicant may amend this statement prior to the hearing, upon consent of the board,

---

42. The Board actually did not issue its written decision until 3 December 1996.

following a motion to amend and 10 days' notice thereof to all parties entitled to original notice of filing." Simply put, Constellation, at best, provided Concerned Citizens with only four days of notice that it planned to revise its petition. From what we can discern from the record, Concerned Citizens' attorney did not receive actual notice regarding the details of the revisions until one day before the hearing. In either event, Constellation provided Concerned Citizens with substantially less notice than the ten days mandated by the statute. Thus, the Board's decision to accept Constellation's revisions constituted a procedural error.

■ Constellation initially argues that the Board in fact did not violate section 59–A–4.24 because that section applies only to those amendments to the petition submitted before the commencement of the first hearing. As further support for Constellation's argument, appellee County contends that the language "this statement" contained in section 59–A–4.24 refers to the statement that the applicant must file in accordance with section 59–A–4.22 at the time of its original filing. They argue therefore that the ten-day notification rule applies only to the initial statement filed pursuant to section 59–A–4.22. We find no merit in either argument. Section 59–A–4.24 is entitled "Amendment of Petition" and we can discern no reason on the face of the statute as to why this section should apply only to amendments raised prior to the initial hearing date. Section 59–A–4.22 requires an applicant to submit, along with its petition for a special exception, "a statement" that includes copies of various documents at the time of filing, including survey plats, architectural drawings, a forest conservation plan, and all additional exhibits which the applicant plans to introduce at the hearing. Thus, if an applicant changes any part of the contents of its statement, section 59–A–4.24 applies, except where the Board directs the revisions.

In the case at hand, Constellation submitted revisions to two of the required pieces of data that must accompany the original petition under section 59–A–4.22: a revised site plan and a revised planting and forestation plan. Because section

59–A–4.24, on its face, states that it applies to amendments to "this statement," and because Constellation's submissions proposed to revise "this statement," we conclude that Constellation, and thus the Board, were bound by the ten-day notification rule. *See Chesapeake Industrial Leasing Co. v. Comptroller of the Treasury,* 331 Md. 428, 440, 628 A.2d 234 (1993) (citation omitted) (" 'Where such words are unambiguous, and are consistent with the statute's purpose, they will be accorded their ordinary significance.' ").

▎ Constellation additionally argues that even if the ten-day notification rule does apply to revisions to an application that occur after the initial hearing, this rule does not preclude the Board from admitting evidence offered less than ten days before a hearing date. Constellation claims that the Board can do so pursuant to its "broad discretionary powers." Constellation does not offer any support for this interpretation of section 59–A–4.24, except to note that if this interpretation was wrong, the Board would not have admitted three of Concerned Citizens' exhibits, ostensibly because these three exhibits were offered and admitted despite the fact that Concerned Citizens did not give ten days' notice to Constellation.[43] We point out that Constellation's purported support is inapposite because the Board's decision to admit exhibits is governed not by the section 59–A–4.24 ten-day notification requirement, but instead, is governed by the Rule 5.0(c) "reasonable notice" requirement. Lacking any support, we can find no reason to adopt Constellation's interpretation.

▎ Appellee County also argues that the Board, when evaluating an amendment, has the discretion, pursuant to section 59–A–4.24, to determine whether to postpone the hearing due to the submission of an amendment. Section 59–A–4.24 provides in pertinent part: "Amendments that are found by the board to alter materially a petitioner's proposal

---

43. As Constellation makes no claim that Concerned Citizens failed to give "reasonable notice" of the aforementioned three exhibits, we will not address that issue herein. *See* Md. Rule 8–504(a)(5); *Ricker,* 263 Md. at 516, 283 A.2d 583.

or evidence are cause to postpone the hearing to a date that permits all interested parties, including but not limited to public agencies, adequate time to review the amendment." This language, however, is stated in conjunction with the first part of the rule requiring the applicant to provide ten days of notice to all interested parties. Nothing in this language indicates that this part of the rule supersedes the ten-day notice requirement. The face of the statute is clear: if the applicant properly and timely submits its amendments ten days in advance of the hearing, only then can the Board exercise its discretion and determine whether the amendment constitutes a material alteration. *See Columbia Road Citizens' Ass'n v. Montgomery County,* 98 Md.App. 695, 702, 635 A.2d 30 (1994) ("It is well settled that statutes should be interpreted according to their plain language."). In the case at hand, Constellation failed to provide Concerned Citizens with the requisite ten days of notice, and thus improperly attempted to amend its petition. Thus, the Board, by allowing Constellation to revise its petition, despite Constellation's failure properly to notify Concerned Citizens, committed a procedural error.

Even if the Board's decision to admit the revisions constituted a procedural violation, Constellation argues that, pursuant to Rule 5.0(f), the Board possesses the discretion to "waive minor procedural defects or errors that do not affect substantive rights of the parties in order to proceed on the merits." Constellation contends that in the context of the entire record in this special exception hearing, Constellation's attempt to revise the petition in order to shorten one wing by twenty feet and to add more trees benefitted Concerned Citizens, and in particular benefitted the Dennises, and therefore, the Board properly could waive the "minor" procedural defect of Constellation's failure to provide Concerned Citizens with ten days of notice. We reject Constellation's argument because, as we will discuss below, *see infra* Section I.B., the Board's decision to allow Constellation to revise its petition, while simultaneously depriving Concerned Citizens a meaningful opportuni-

ty to respond to the revisions, constituted a prejudicial, rather than a "minor," error.

Constellation also contends that a strict application of the ten day notification rule would foster an "abuse of process" because if the Board lacks the ability to overlook a minor procedural error, the opposition could extend a hearing indefinitely by repeatedly arguing that the applicant has modified its petition. Constellation argues, therefore, that before this Court can reverse the decision of the Board, this Court must find that the Board's failure to adhere to the ten-day notification rule constituted prejudicial error. Because, as we discuss below, *see infra* Section I.B., the Board's error prejudiced Concerned Citizens, we need not decide whether, on appeal, the appellate court must always find prejudicial error before reversing a decision of the Board.

Lastly, we note Constellation's argument that, pursuant to section 59–G–1.22(a) of the Zoning Ordinance, the Board possessed the authority to add additional requirements to the special exception petition in order to protect adjacent properties, and that this Court should not read the ten day rule to limit the Board's authority in this regard. Section 59–G–1.22(a) provides:

> (a) The board, the hearing examiner, or the district council, as the case may be, is hereby empowered to add to the specific provisions enumerated *in this section,* any others that it may deem necessary to protect adjacent properties, the general neighborhood, and the residents, workers, and visitors therein.

*Id.* (emphasis added).

Section 59–G–1.22(a) is included in the section of the Zoning Ordinance that describes the conditions that an applicant must meet before the Board can grant its petition for a special exception. *See* Zoning Ordinance § 59–G–1.2. For example, section 59–G1.21(a)(4) mandates that the proposed use be "in harmony with the general character of the neighborhood considering population density, design, scale and bulk of any proposed new structures, intensity and character of activity,

traffic and parking conditions and number of similar uses." Similarly, section 59–A–1.23 mandates that the special exception comply with general development standards including height limitations and area, frontage, and setback requirements. In light of its context, we read section 59–G–1.22 as authorizing the Board to add any conditions it deems necessary to protect adjacent properties. The Board, however, did not propose the two revisions Constellation offered on 25 November 1996; instead, Constellation offered the revisions, and thus was subject to the requirements of section 59–A–4.24.

2.

■■■ Rule 5.0(c) of the Board of Appeals Rules of Procedure provides that the Board, "on motion by any party, or by the Board, [may] introduce into the record documentary or other evidence, provided that all parties are given reasonable notice." In the case at hand, Constellation introduced five new exhibits on the final day of the hearing, after giving Concerned Citizens' attorney one day to review the exhibits visually. The question then is whether one day of notice constitutes the "reasonable notice" contemplated by Rule 5.0(c). We conclude that it does not.

We glean the lower-end boundary of what constitutes "reasonable notice" from the following discussion that ensued in the 1 October 1996 Board hearing when Concerned Citizens attempted, without giving Constellation prior notice, to introduce new exhibits, including computer-generated pictures depicting how the project would appear from several different vantage points. When Concerned Citizens attempted to introduce these exhibits, Constellation moved to exclude them on the ground that the Board of Appeals's rules required parties to submit new exhibits ten days prior to the hearing. Constellation had received these exhibits five minutes before one of Concerned Citizens' witnesses attempted to utilize the exhibits as a part of his testimony. Concerned Citizens argued that its exhibits did not constitute revisions and therefore that the ten day rule did not apply.

Nevertheless, the Board granted Constellation's motion, stating, among other things, that Constellation is "entitled to at least ten days to review the material ... [because] [i]t would be absolutely unfair to ask [Constellation] to cross examine on material [it] just saw this afternoon." Chairman Strang commented that in this case the pictures could be "quite complicated," and another member of the Board argued that applicants and the opposition alike should have the opportunity to prepare a response when they receive new information. That Board member noted, "we always push to make sure that the opposition has a chance to respond rather than responding on site at that time." Although the Board denied Concerned Citizens' attempt to introduce the actual exhibits during the 1 October 1996 hearing, the Board did permit Concerned Citizens' witness to testify verbally about the contents of the exhibits.

Concerned Citizens did not introduce these exhibits until 25 November 1996, because although the Board conducted another hearing on 2 October 1996, the Board determined that one day was not enough time for Constellation to prepare a response.[44] Specifically, Chairman Strang stated that Constellation did not need to be prepared to discuss the computer-generated pictures at the next day's hearing because "that seems like a very pressurized situation." Instead, Chairperson Strang noted that Constellation should be prepared to discuss them within a "reasonable" amount of time.

Based on Chairperson Strang's comments and the Board's decision to exclude Concerned Citizens exhibits from admis-

---

44. Curiously, Concerned Citizens did not introduce these exhibits on the sixth hearing date, 22 October 1996, and Mr. Wilkoff, Concerned Citizens' expert witness, did not testify at that hearing. We do not know whether Concerned Citizens did not introduce the exhibits on 22 October 1996 due to the fact that Constellation had not received a "reasonable" amount of time to review them, or whether there was some other explanation. In any event, for our purposes here, the fact that the Board did not consider one day's notice between 1 and 2 October 1996 "reasonable" is sufficient support for our conclusions regarding the lower-end boundary of what constitutes "reasonable notice."

sion until 25 November 1996, we can conclude that, at least for the purposes of this case, when the pictures and exhibits are "quite complicated," one day's notice does not constitute "reasonable notice" under Rule 5.0(c). On 25 November 1996, Constellation introduced, among other things, a mylar sheet depicting the additional landscaping. This mylar sheet was, in essence, a new view (picture) of the Residence, incorporating the 25 November 1996 revisions. Furthermore, Constellation introduced a revised site plan and a revised planting and forestation plan, both offering different visualizations of the proposed Residence. Constellation gave Concerned Citizens, at best, one day to review these exhibits. The Board, in deciding to admit these exhibits, made no attempt to distinguish the 25 November 1996 situation and decision from the earlier situation and contrary decision on 1 October 1996. Finding no tangible difference between the exhibits Constellation introduced on 25 November 1996 and the exhibits Concerned Citizens attempted to introduce on 1 October 1996, we conclude that, pursuant to the Rule 5.0(c) "reasonable notice" requirement, Concerned Citizens was entitled to more than one day's notice of and an opportunity to evaluate new exhibits. Because neither the Board nor Constellation gave Concerned Citizens that opportunity, we find that the Board's decision to admit these exhibits on 25 November 1996 constituted a procedural error.

3.

 Rule 7.2.6 of the Board of Appeals Rules of Procedure provides that "[a]s a rule the record is closed at the end of a hearing." The Board, however, *"will* hold the record open for fifteen days after the conclusion of a hearing," *id.* (emphasis added), if one of the following three situations exists:

a. [T]he Planning Board or planning staff submit a report on the application less than 5 days before the hearing date;

b. [A]n amended application is filed less than 10 days before the hearing or during the hearing; or

 c. [O]ther circumstances occur to justify holding the record open at the Board's discretion.

*Id.* In the case at hand, as discussed *supra,* Constellation essentially filed an amended application during the hearing. Therefore, pursuant to Rule 7.2.6(b), the Board improperly closed the record at the conclusion of the hearing.

The Board's statement at the conclusion of the 25 November 1996 hearing that it was closing the record engendered no discussion from either party. Concerned Citizens, at this time, did not renew its objection to the Board's decision to admit Constellation's revisions and exhibits and did not raise an objection based on Rule 7.2.6. Furthermore, the Board did not offer any special justification for its decision to close the record.[45] The only reference the Board made to closing the record at the conclusion of the hearing came at the onset of hearing when Chairman Strang stated that that day's hearings would be the final day of hearings in this matter, and that the Board would vote on the special exception the following day. The Board's attempt at expediency, while commendable in some cases, offers little support for its decision to close the record despite Concerned Citizens' request for additional time to respond to Constellation's revisions. We can find no reason on the record for the Board's decision to deviate from Rule 7.2.6(b), and therefore we conclude that the Board's actions violated this procedural rule as well.

Constellation, in its appellate brief, does not argue that the Board's decision to close the record at the conclusion of the hearing comported with Rule 7.2.6(b). Instead, Constellation argues that Concerned Citizens waived its right to object to

---

**45.** By this, we do not mean to imply that Rule 7.2.6 requires the Board to make an on-the-record statement justifying its decision to close the record. To the contrary, the general rule enumerated in Rule 7.2.6 states that the Board will close the record at the end of the hearing. We only raise this issue in light of the fact that Constellation, by its own admission, offered revisions during the course of the hearing, which the Board accepted. The Board's acceptance of these revisions necessarily implicated Rule 7.2.6(b), and thus, we find worth mentioning that the Board never referenced this rule.

the Board's decision to close the record both by failing to raise an objection at the conclusion of the hearing when the Board actually closed the record, and by failing to ask the Board to reconsider its decision to close the record in its 13 December 1996 Motion for Reconsideration.

This Court addressed a similar issue in *Meadowridge Industrial Center Ltd. P'ship v. Howard County*, 109 Md.App. 410, 420–23, 675 A.2d 138 (1996). In *Meadowridge*, appellants challenged the validity of a particular solid waste management plan that the Howard County Council approved on 6 June 1994. *Id.* at 420, 675 A.2d 138. Appellants stated that the proposed plan was introduced on 7 February 1994, and that the Council held hearings on the plan on 22 February 1994. *Id.* Appellants claimed that the plan approved on 6 June 1994 contained significant changes from the provisions of the 7 February 1994 proposal, and that as a result, the Council was required to hold new hearings on the revised plan. *Id.* Consequently, appellants argued that the Howard County Zoning Board's subsequent reliance on this approved plan constituted reversible error. *Id.* Appellees, in response, pointed out that although another party who opposed appellees' petition raised the issue of the validity of the 6 June 1994 plan in the proceedings before the Zoning Board (and the Zoning Board rejected that argument), appellants failed to preserve this issue for this Court's review because they failed to raise it themselves. *Id.*

This Court in *Meadowridge* first stated the general rule regarding preservation of issues in administrative cases:

"A party who knows or should have known that an administrative agency has committed an error and who, despite an opportunity to do so, fails to object *in any way or at any time* during the course of an administrative proceeding, may not raise an objection for the first time in a judicial review proceeding."

*Id.* at 421, 675 A.2d 138 (emphasis added) (citing *Cicala v. Disability Review Bd. for Prince George's County*, 288 Md. 254, 262, 418 A.2d 205 (1980)). Noting that another party did

raise the issue before the Zoning Board and that the Zoning Board decided the issue, we concluded that there, the appellants' failure to raise the issue themselves in the proceeding before the Zoning Board did not bar them from raising the issue before this Court. *Meadowridge,* 109 Md.App. at 421, 675 A.2d 138. This Court stated:

> Our ruling stems from the rationale for the preservation requirement. The primary purpose of the rule requiring a party to raise an issue in an administrative proceeding before it can raise that same issue again on appeal is to give the administrative agency the opportunity to decide the issue first; when an appellate court is the first to decide an issue, it deprives the agency of that opportunity.

*Id.* This Court therefore concluded that "the fact that the validity issue was raised in the proceedings before the Zoning Board is sufficient to satisfy the purposes of the preservation requirement." *Id.* at 422, 675 A.2d 138.

 In the case at hand, Concerned Citizens, during the 25 November 1996 hearing, objected when the Board decided to allow Constellation to revise its petition and to introduce new exhibits on the final day of the hearing and at the same time decided to deny Concerned Citizens the opportunity, beyond the hearing date, to respond to these revisions and exhibits. Concerned Citizens' attorney offered the following objection:

> We need an opportunity now which we have not had to put this into the computer, to come back and to make our comment. That's—we were just notified of this yesterday and we do need that. Now, obviously we would be greatly prejudiced if this were to be approved on the ground that the Board felt this modified it in some way to make it compatible and we haven't had an opportunity to then respond.

Thus, Concerned Citizens objected to its lack of opportunity to add to the record beyond 25 November 1996. Because the general rule regarding preservation of an issue in an administrative case for appellate review addresses a party's failure to

object " 'in any way or at any time during the course of an administrative proceeding' " *Meadowridge,* 109 Md.App. at 421, 675 A.2d 138 (citations omitted), Concerned Citizens' failure to object again at the conclusion of the hearing when the Board actually closed the record does not result in non-preservation of this issue for our review.

Furthermore, the rationale for the preservation requirement is that the administrative agency should have the opportunity to decide the issue first. *Id.* In this case, when Concerned Citizens asked the Board for additional time, beyond 25 November 1996, to respond to Constellation's revisions, the Board had the opportunity either to conduct an additional hearing or to leave the record open for further comment. The Board decided to follow neither course. Instead, the Board, following its proclamation at the onset of the hearing that the hearing "just has to be finished up with this batch," closed the record at the end of the hearing and voted the next day to grant Constellation's petition. Because the Board had the opportunity to decide this issue, we conclude that Concerned Citizens satisfied the rationale behind the preservation requirement and properly raises this issue on appeal.[46]

▮ Constellation additionally challenges Concerned Citizens right to raise this issue on appeal on the grounds that Concerned Citizens could have raised, but did not, this issue in its 13 December 1996 Motion for Reconsideration. Constellation contends that because the grounds for reconsideration under Rule 10.1.2 of the Board of Appeals Rules of Procedure include a "mistake" made at the original hearing, Concerned Citizens' failure to include the Board's alleged "mistake" with

---

46. The County additionally argues that "not only did [Concerned Citizens] fail to object to the closing of the record, but [it] also made no proffer of additional evidence within [fifteen] days of the hearing." Because the Board voted on the special exception petition on 26 November 1996, one day after the final hearing date, the Board thus precluded Concerned Citizens from even proffering additional information for the record. We therefore find that the County's argument lacks merit.

regard to closing the record results in nonpreservation of this issue for appeal. By so arguing, Constellation essentially contends that for a party to raise an issue in an appeal from the Board, the party must first raise that issue in a Request for Reconsideration. We can find no support for this proposition. Under the Board of Appeals Rules of Procedure, Concerned Citizens had the opportunity, pursuant to Rule 2.0,[47] to appeal from an administrative decision, and the opportunity, pursuant to Rule 10.2,[48] to request reconsideration. The opportunity to appeal the Board's decision is not contingent on a request for reconsideration. Because we have found that Concerned Citizens, by objecting to the Board's decision to admit the revisions without giving it additional time to respond, properly preserved this issue for our review, Concerned Citizens' failure to raise this issue in its request for reconsideration is of little consequence.

4.

 Section 59–A–4.48(c) provides: [49]

After the planning board or its technical staff has issued its initial report and recommendation, the applicant *must* transmit to the planning board a copy of any subsequent amendment to the petition. The record *must* remain open for a reasonable time to provide an opportunity for the planning board or its staff to comment. Within that time, the planning board or its staff *must* comment on the amend-

---

**47.** Rule 2.0 provides: "Unless the applicable law specifies a shorter time, an appeal from an administrative decision must be filed within 30 days after the decision was mailed."

**48.** Rule 10.2 provides: "Any request for rehearing or reconsideration must be filed within in 15 days after the date the Opinion is mailed and entered in the Opinion Book.... The request must be in writing and specify the nature of the relief desired and provide reasons supporting the request."

**49.** In addition, section 59–A–4.24 provides in pertinent part: "An applicant may amend this statement prior to the hearing.... The amendment must also be referred to the planning board, in accordance with subsection 59–A–4.48(c)."

ment or state that no further review and comment are necessary.

*Id.* (emphasis added). Concerned Citizens argues that the Board violated section 59–A–4.48(c) when it allowed Constellation to amend its petition on 25 November 1996, and then closed the record without providing the planning board or its technical staff the opportunity to comment on the amendments. Because section 59–A–4.48(c) is a "directory" rather than a "mandatory" provision, we conclude that the Board, by closing the record before submitting the revisions to the planning board, did not commit a procedural error. We explain.

In *Columbia Road Citizens' Association v. Montgomery County*, 98 Md.App. 695, 635 A.2d 30 (1994), this Court considered whether section 59–A–4.48(c) constituted a mandatory or a directory statutory provision.[50] *Id.* at 700, 635 A.2d 30. This Court distinguished mandatory and directory provisions as follows: "Non-observance of '[a] mandatory provision in a statute ... renders the proceeding to which it relates illegal and void, while [the observance of] a directory provision ... is not necessary to the validity of the proceedings.' " *Id.* at 701, 635 A.2d 30 (citing *Bond v. Mayor & City Council*, 118 Md. 159, 166, 84 A. 258 (1912)). Furthermore, "the essence of the 'mandatory/directory' distinction [is]: 'if the command is "mandatory" some fairly drastic sanction must be imposed upon a finding of noncompliance, whereas if the command is "directory," noncompliance will result in some lesser penalty, or perhaps no penalty at all.' " *Columbia Road*, 98 Md.App.

---

**50.** In *Columbia Road Citizens' Association v. Montgomery County*, 98 Md.App. 695, 635 A.2d 30 (1994), this Court specifically focused on the second two sentences of section 59–A–4.48(c): "The record must remain open for a reasonable time to provide an opportunity for the planning board or its staff to comment. Within that time, the planning board or its staff must comment on the amendment or state that no further review and comment are necessary." *Columbia Road*, 98 Md.App. at 702, 635 A.2d 30. Because this Court explored the meaning of the word "must" in the context of this ordinance, we find no reason to limit that definition to the second two sentences, and thus, apply the logic of the *Columbia Road* Court to the entire section.

at 702, 635 A.2d 30 (citing *Tucker v. State,* 89 Md.App. 295, 298, 598 A.2d 479 (1991)).

This Court stated:

> Appellants argue that "the purpose of the Montgomery County statute is not merely to allow the Planning Board or its Staff an *opportunity* to voice their opinion, but rather to *ensure* that the Board of Appeals has the benefit of their knowledge or the awareness that the Planning Board or Staff believes no further review and comment are necessary." While 59–A–4.24 states that "[t]he amendment must also be referred to the planning board, in accordance with subsection 59–A–4.48(c)," it concludes: "Nothing in this section prohibits the board, during the hearing *or at any time before the record is closed,* from requesting the applicant to revise any aspect of the proposal." (Emphasis added). This section allows the Board to request changes up until the moment the record is closed, and does not include any provision for the review of those changes by the planning board or its technical staff. The language of 59–A–4.24 is inconsistent with a reading interpreting subsection 59–A–4.48(c) as mandatory. The Board is not required to wait for planning board comments on all amendments before having the authority to render decisions. Further[,] to allow appellants' interpretation would, in effect, give the planning board a "pocket" veto over the Board's ability to take action on any amended application for a special exception merely by delaying indefinitely comments on an amended application.

*Columbia Road,* 98 Md.App. at 704, 635 A.2d 30. This Court further noted that section 59–A–4.48(c) lacks any penalty requirements or restrictions on the Board's actions in this context, and that "[t]he lack of any sanction in the statute tends to militate towards a finding that the statute or provision is directory." *Id.* at 701, 706, 635 A.2d 30. Because section 59–A–4.48(c) is directory rather than mandatory, we conclude that the Board's failure to adhere to the section's provisions does not constitute reversible error.

## B.

◼ We next address whether, on the facts of this case, the Board's procedural errors prejudiced Concerned Citizens.[51] In *Jacocks v. Montgomery County*, 58 Md.App. 95, 472 A.2d 485 (1984), this Court stated:

> To establish that there has been a reversible error, "the burden is on the appellant in all cases to show prejudice as well as error. . . ." If errors "are of such a character, and so interwoven with the case, as to lead a fair and impartial mind, trained and experienced in judicial investigation, upon an examination of the whole case and all the rulings involved therein, to the conclusion that there is a reasonable probability that such errors may have affected the determination of the case, they are prejudicial and reversible."

*Id.* at 107, 472 A.2d 485 (citations omitted) (emphasis omitted). Concerned Citizens argues that it suffered prejudice as a result of the Board's decision to deny Concerned Citizens' request for additional time to respond to Constellation's revisions and exhibits and instead closed the record at the conclusion of the 25 November 1996 hearing. As a result of these actions, Concerned Citizens argues that it did not have a reasonable opportunity: (1) to consult with Richard Wilkoff, Concerned Citizens' expert witness in architecture; (2) to analyze the new exhibits; and (3) to prepare counter-exhibits and testimony demonstrating that the proposed revisions did not mitigate (or to what degree it did mitigate) the adverse impact Concerned Citizens claimed the Residence had on the surrounding neighborhood, particularly the Dennis home.[52]

---

**51.** Because of the prejudice that Concerned Citizens suffered as a result of the Board's procedural errors, we need not address Concerned Citizens' argument that pursuant to the *Accardi* doctrine, violation of procedural rules requires reversal as a matter of law.

**52.** Concerned Citizens also argues that it was prejudiced by the Board's actions because the Planning Board was deprived of the opportunity to comment on the final amended project. Because we found no procedural error in the Board's failure to submit the revisions to the Planning Board, *see supra*, we need not address whether the Board's actions in this regard prejudiced Concerned Citizens.

Concerned Citizens also argues that because its attorney received copies of the new exhibits only one day before the hearing, and on a Sunday at that, that its attorney did not have a reasonable opportunity to consult with his client. We conclude that, standing alone, the Board's violation of section 59–A–4.24, the ten-day notification rule, or Rule 5.0(c), the right to receive reasonable notice regarding the introduction of evidence may not constitute reversible error; however, in this case, when the Board compounded its procedural errors by closing the record in violation of Rule 7.2.6 and thereby failed to give Concerned Citizens an adequate and reasonable opportunity to respond to the revisions and new exhibits, the sum total of the procedural errors rises to the level of reversible error. It is on this basis that we vacate the circuit court's order.

Chairman Strang summarized the crux of this case when, during the course of the 1 October 1996 hearing, she noted: "Pictures, I think, in this case can be quite complicated." We agree. In this case, both parties relied on computer-generated pictures of the Residence as evidence of the impact the Residence might have on the surrounding neighborhood. These pictures depicted the Residence in different seasons and from different angles and included the landscaping of the property as well as the Residence itself. On 1 October 1996, when Concerned Citizens attempted to introduce as exhibits several of these pictures into evidence, the Board granted Constellation's motion to exclude on the grounds that Concerned Citizens gave Constellation only five minutes' notice of the new exhibits. While the Board allowed Concerned Citizens' witness to testify verbally about the contents of the exhibits on 1 October 1996, Concerned Citizens ultimately did not introduce its exhibits until the 25 November 1996 hearing. Concerned Citizens did not introduce its exhibits at the 2 October 1996 hearing because the Board felt that one day was not enough time for Constellation to prepare a response to the new exhibits.[53] The Board reasoned that Constellation was

---

53. As discussed *supra,* we are uncertain as to why Concerned Citizens did not introduce the exhibits on 22 October 1996, the sixth hearing date.

"entitled to at least ten days to review the material ...
[because] [i]t would be *absolutely unfair* to ask [Constellation]
to cross examine on material [it] just saw this afternoon."
(Emphasis added).

On 25 November 1996 the Board, on similar facts, reached
an opposite result. During the course of that hearing, Con-
stellation attempted to introduce revisions to its petition and
new exhibits after giving Concerned Citizens one day to
review them. The Board, over Concerned Citizens' objection,
allowed Constellation to revise its petition and accepted the
new exhibits into the record of the case. The new exhibits
included a mylar overlay, which Constellation affixed to a
piece of posterboard containing three enlarged computer-
generated pictures of the Residence as viewed from the Den-
nis home. The mylar overlay was a visual depiction of the
revisions that Constellation offered on 25 November 1996. It
contained additional trees and bushes to illustrate the addi-
tional landscaping, and it contained a line drawn on the east
wing of the Residence, designed to indicate where Constella-
tion planned to shorten the building. The effect of the mylar
overlay was to offer a visual contrast between the landscaping
that Constellation had proposed prior 25 November 1996 and
the landscaping as it would appear with the revisions.

Based on the Board's comments on 1 October 1996, we
clearly can discern that the Board felt that Concerned Citi-
zens' attempt to submit pictorial exhibits on the day of the
hearing would prejudice Constellation. The Board's com-
ments also reveal that, even if Concerned Citizens had given
Constellation one day of notice, one day would be insufficient
in this case given the sophisticated genesis of the pictures.
We agree with this analysis.

The Board made no attempt, however, to explain why the
revisions and exhibits Constellation offered on 25 November
1996 were any less complicated than those Concerned Citizens
attempted to introduce at the earlier hearing. From the face
of the record, we can discern one possible reason for the
discrepancy: The Board stated: "This is an effort to make an

improvement and I think we have done it—allowed many other applicants to do it and I intend to allow this one." The Board's statement that the 25 November 1996 revisions constituted "improvements," helpful to Concerned Citizens, is the only apparent reason for its ultimate conclusion that the lack of notice did not prejudice Concerned Citizens. We can infer one additional reason for the. Board's decision to allow Constellation to submit its revisions and additional exhibits: The Board noted at the outset of the hearing that this would be the final day of the hearings and that the Board would vote on the special exception the following day. Chairman Strang stated that "we cannot saddle a new Board member with this record," and that "it just has to finished up with this batch." Neither of these two reasons—the stated or the implied reason—is sufficient to overcome the prejudice Concerned Citizens suffered when the Board denied it a reasonable opportunity to prepare a response to Constellation's revisions and exhibits.

While we recognize that the Board has the right to be concerned about efficiency and expediency with regard to its proceedings, we conclude that in this case, when the Board was faced with new revisions and additional exhibits on the last day of the hearing, the Board had two choices: Either deny Constellation the right to revise its petition in the eleventh hour, or give Concerned Citizens extra time to respond to the revisions.[54] The fact that the Board exercised neither option and instead closed the record constitutes the Board's fatal error. We explain.

Although the Board characterized the revisions as "improvements," the Board's decision to close the record and to vote the next day on the petition prejudicially deprived Concerned Citizens of the opportunity to offer an effective and well-reasoned response. Simply stated, by the Board's own admis-

---

54. For example, the Board could have left the record open to receive any surrebuttal evidence from Concerned Citizens. Alternatively, the Board could have scheduled another hearing for the limited purpose of receiving evidence in response to Constellation's revisions and exhibits.

sion, one day is not enough time to prepare a response to an opponent's revisions or exhibits, regardless of whether the changes constitute "improvements." Significantly, the Board's conclusion that one day is not enough time came when Concerned Citizens attempted to introduce new exhibits; such exhibits, however, are subject only to the "reasonable notice" requirement. Here, Constellation attempted not only to introduce new exhibits, but more importantly, Constellation attempted to revise its petition. For such revisions, section 59–A–4.24 of the Zoning Ordinance requires ten days' notice.

The Board's decision effectively prevented Concerned Citizens from even addressing whether all or some of the changes constituted improvements. Concerned Citizens rightfully argues that the Board gave it an inadequate amount of time to prepare and offer an argument as to why the improvements did little to mitigate the impact of the Residence on the surrounding neighborhood. Given the significance of pictorial evidence in this case, the Board should have given Concerned Citizens the opportunity to determine whether it wanted to prepare a pictorial response. One day of notice precluded that opportunity.

We find Constellation's argument that Concerned Citizens could have addressed its concerns about the revisions through its cross-examination of Mr. Morris or by recalling its expert witness, Mr. Wilkoff, unpersuasive. The fact remains that Concerned Citizens had no adequate opportunity, adequate— defined as more than one day—to prepare its cross-examination of Mr. Morris on this basis. Furthermore, Mr. Wilkoff, Concerned Citizens' expert witness, had no adequate opportunity to evaluate the revisions and new exhibits and to incorporate his evaluation into his testimony.

Importantly, the Board, in its decision, specifically referenced Constellation's revisions and additions when it found that the Residence achieved architectural compatibility with the surrounding neighborhood. Although the Board did not parse out whether it would have approved the petition even without the final revisions, the Board did indicate that "[a]ddi-

tions to the landscaping plan tend to enhance the unity of the design," and that "[t]he revised building successfully represents a serious effort to respond to community concerns about the bulk of the building." Again, we do not know whether the Board's decision would have been the same absent the 25 November revisions and exhibits; we do know, however, from the Board's general references to Constellation's revisions that the Board did consider those changes in order to respond to the community's concerns. The community was denied an effective response to the 25 November 1996 revisions, and given the possibility that the Board could have relied, in part, · on those revisions when making its final decision, we cannot conclude that the Board's actions constituted harmless error.

The process of petitioning for a special exception often becomes an adversarial process. Depriving one party of the right to respond adequately to the other undermines the nature of the process and unfairly advantages one party over the other. The Board said as much itself on 1 October 1996. The pictorial contrast between the petition proposal as it existed prior to 25 November 1996 and the petition as revised on 25 November 1996 and as depicted on the mylar sheet is clear evidence of the changes Constellation sought to introduce in the final hours of the hearings. As any good applicant should, Constellation sought to enhance the success potential of its petition by adding more trees and reducing the profile of the Residence that was closest to the Dennis home. But, as the rules dictate, an applicant in Montgomery County also must provide adequate notice to its opposition regarding its intended revisions and exhibits. · The Board's decision to overlook Constellation's failure to adhere to the Rules and to the Zoning Ordinance cannot be winked at by this Court. On remand, Concerned Citizens will have its rightful opportunity to respond to the revisions.

## II. and III.

Because of our disposition of Issue I., we shall not decide Issues II. and III. herein. Having said that, we are moved nonetheless to comment on one aspect of Issue II. The Board,

in reaching its decision, added several conditions to its grant of Constellation's special exception petition. Notably, the Board required the following condition:

5. The holder of the special exception will submit a revised landscape and lighting plan to the Board of Appeals. The plan will reflect discussions with the neighbors on Fawsett [sic] Road, and modifications to improve the buffering and screening of the building. The plan should reflect additional evergreen screening and deciduous plants both within the setback area and the public right-of-way along MacArthur Boulevard and Falls Road, if permitted by the County, the State and/or the Army Corps of Engineers. The plan should also reflect additional evergreen screening along the northern and eastern property lines adjacent to the parking and building area.

Section 59–A–4.22(4) provides that, among other things, the petition must include "[c]omplete information about the size, type and location of any existing and proposed trees, landscaping and screening of any exterior illumination proposed. This requirement may be satisfied by site plan documents...." In addition, section 59–G–2.37, sets forth the specific prerequisites the Board must find before approving a special exception for a nursing home or a domiciliary care home. The prerequisites include, among others:

1. [T]he use will not adversely affect the present character or future development of the surrounding community due to bulk, traffic, noise, or number of residents;

2. [T]he use will be housed in buildings architecturally compatible with other buildings in the surrounding neighborhood....

*See* Zoning Ordinance § 59–A–2.37(a)(1), (2).

As discussed *supra*, section 59–A–4.24 requires the petitioner to submit any revisions to its original petition in the form of an amendment. The Board then decides whether to accept or reject such an amendment, and the opposition has the opportunity to respond. We recognize also that, pursuant to section 59–A–4.24, the Board has the right to "request the applicant

to revise any aspect of the proposal," but the Board must do so "during the hearing or at any time before the record is closed." The Board's approach, in imposing Condition No. 5, seems at best inconsistent and illogical and at worst casts doubt on the validity of the approval of the petition.

If the Board concluded that Constellation's evolved landscaping plan did not satisfy the minimum requirements of the Zoning Ordinance for approval of a special exception, the Board either should have denied the petition, or, pursuant to section 59–A–4.24, requested Constellation to revise its petition before closing the record. The Board did neither. Instead, the muddled approach to framing Condition No. 5 begs the question. The question needing to be answered before a special exception may be approved (if one accepts the statutory premise that, in Montgomery County according to section 59–A–2.2(b) of its Zoning Ordinance, the requirements set forth in the Ordinance "are declared to be the minimum requirements for the protection of health, morals, safety and general welfare of the public") is: What landscaping plan will satisfy the threshold requirements of the ordinance in order to justify approval of the petition. Condition No. 5, although fairly clearly advancing the inference that Constellation's landscaping plan, as amended through and including the 25 November 1996 hearing, was not sufficient, indicates generally that the Board deemed more plantings necessary in certain areas of the property; however, the specific number, types, sizes, and locations of the additional landscaping were left to future negotiations by Constellation with, among others, the Fawsett Road neighbors, the County, the State, and/or the Army Corps of Engineers, as well as possible further proceedings before the Board of Appeals. We could find nothing in the findings of the Board that would illuminate what the Board thought were the deficiencies in Constellation's revised landscape proposal such that Condition No. 5 became necessary. To the contrary, we read the Board's relevant finding, reproduced below, as suggesting that Constellation's revised landscape plan was sufficient to garner approval:

Setbacks from the roads and from all property lines not only exceed development standards but they provide ample room for landscaping. While the Board will include a condition requiring the applicant to work with the neighbors on the landscape plan and to submit it again for the Board's review, the Board is nonetheless satisfied that the landscape plan has achieved a reasonable level of screening and has contributed to a finding of harmony with the character of the neighborhood.

The Board heard a great deal of testimony about the rustic nature of the neighborhood and how the development would be out of character with it. The Board finds that the existing vegetation on the site could not be characterized as rustic. Except for a stand of trees in the northeast corner, the property is primarily covered by scrub growth. The landscaping proposed by the applicant attempts to buffer the view of the building with a natural look to fit in better with surrounding homes. In addition, the existing tree stand in the northeast corner will be preserved by a conservation easement and enhanced by .3 acres of reforestation. The Board is persuaded that any development on the property, whether permitted by right or by special exception, would remove the existing vegetation and replace it with something newer than what surrounds it.

In evaluating the applicant's highly technical and accurate computer-aided representations of the proposed landscaping, the Board found that presentations included all standard views of the property. Perspective drawings included six different views based upon realistic projections of plant growth. The applicant demonstrated that the landscape plan would properly buffer the view of the building. The Board found that the landscape plan was superior to what might be viewed as appropriate. The landscaping will compliment the site and while it might not mirror the neighboring properties, it will be compatible. The views shown provided a range of time periods from construction through ten years. It is the Board's opinion that all seasons

were fairly displayed without reliance on worst case scenarios.

(Opinion of the Board, Effective 3 December 1996; page 18).

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH INSTRUCTIONS THAT IT REMAND THE CASE TO THE MONTGOMERY COUNTY BOARD OF APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; APPELLEES TO DIVIDE THE COSTS EQUALLY.